**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**LEROY FIELDS (#115883)**                                           **CIVIL ACTION**

**VERSUS**

**N. BURL CAIN, WARDEN, ET AL.**                                    **NO. 11-0244-BAJ-DLD**

**NOTICE**

    Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

    In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

    ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

    Signed in Baton Rouge, Louisiana, on November 8, 2012.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**LEROY FIELDS (#115883)**                                         **CIVIL ACTION**

**VERSUS**

**N. BURL CAIN, WARDEN, ET AL.**                                   **NO. 11-0244-BAJ-DLD**

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

This matter is before the Court following an evidentiary hearing held pursuant to 28 U.S.C. § 636(b)(1)(B) on the issue of administrative exhaustion. The Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983.

Procedural History

The pro se plaintiff, an inmate incarcerated at the Louisiana State Penitentiary ("LSP"), Angola, Louisiana, filed this action pursuant to 42 U.S.C. § 1983 against Warden N. Burl Cain, Ass't Warden Chad Menzina, Major Chad Butler, Supervisor James Douzart, Capt. Johnny Tubbs, Sgt. Ray Jones, and Sgt. Dennis Hall, complaining that the defendants violated the plaintiff's constitutional rights on July 27, 2010, by failing to protect him from harm at the hands of a co-inmate. Pursuant to earlier Magistrate Judge's Report in this case, approved by the District Judge on November 30, 2011, see rec.doc.nos. 23 and 24, all of the plaintiff's claims have been dismissed except his claim asserted against defendant James Douzart that on July 27, 2010, the defendant allowed a co-inmate who was on the plaintiff's enemy list to obtain access to the plaintiff's cell tier, resulting in the co-inmate attacking the plaintiff and causing injury.

On April 12, 2012, a second Magistrate Judge's Report was entered herein, recommending denial of a Motion for Summary Judgment filed by defendant Douzart. The Court found that there were disputed issues of material fact on the issue whether the plaintiff had exhausted administrative remedies relative to the remaining claim as mandated by 42 U.S.C. § 1997e. Pursuant to this statute, the plaintiff was required to exhaust available administrative remedies prior to commencing a lawsuit in federal court relative to prison conditions. This provision is mandatory and applies broadly to "all suits about prison life". Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.ed.2d 12 (2002).

In the referenced Motion for Summary Judgment, the defendant argued that the plaintiff had failed to exhaust administrative remedies because he had voluntarily withdrawn, prior to completion, the administrative grievance which he had filed relative to the claim asserted herein.  The plaintiff responded that he had in fact signed a form withdrawing the referenced grievance.  The plaintiff asserted, however, that the withdrawal had not been voluntary, but rather, had been the result of coercion and threats by security officers.  According to the plaintiff, several security officers had visited his cell on January 14, 2011, and had urged him to withdraw the referenced grievance.  When the plaintiff refused, the officers had allegedly cursed and yelled at him and had threatened to ensure that he was never released from punitive segregated confinement at LSP.  The plaintiff further asserted, in opposition to the defendant's Motion, that the officers had planted contraband in the plaintiff's cell on that date and had transferred the plaintiff to administrative segregation in connection with a resulting false disciplinary report.  Several days later, the officers had allegedly returned, had brandished cans of irritant spray, and had again yelled, cursed and threatened to maintain the plaintiff in segregated confinement if he did not withdraw the grievance.  The officers had also allegedly promised the plaintiff, as an inducement, to allow the plaintiff to transfer out of segregated confinement at Camp J if the plaintiff withdrew the grievance.  The plaintiff asserts that it was only in response to the threats and harassment by these officers that he had signed a form withdrawing the referenced grievance.  In support of this assertion, the plaintiff pointed to the withdrawal form itself, upon which he had signed his name as "Leroy U.D. Fields", with the "U.D." signifying that he was signing the form "U[nder] D[uress]".

The Fifth Circuit has held that the administrative exhaustion requirement "may be subject to certain defenses such as waiver, estoppel, or equitable tolling".  Wendell v. Asher, 162 F.3d 887 (5th Cir. 1998).  Specifically, the requirement of administrative exhaustion may be dispensed with when administrative remedies are "unavailable" to an inmate, when prison officials have ignored or interfered with an inmate's pursuit of administrative remedies, or when "special circumstances" warrant a conclusion that exhaustion should not be required.  Dillon v. Rogers, 596 F.3d 260 (5th Cir. 2010).  Courts which have addressed this issue have found that interference by prison officials with an inmate's pursuit of administrative remedies may render administrative remedies unavailable or may constitute grounds for estoppel when prison officials have threatened retaliation against an inmate for the filing of administrative grievances.  See, e.g., Tuckel v. Grover, 660 F.3d 1249 (10th

Cir. 2011); Turner v. Burnside, 541 F.3d 1077 (11th Cir. 2008); Macias v. Zenk, 495 F.3d 37 (2nd Cir. 2007); Kaba v. Stepp, 458 F.3d 678 (7th Cir. 2006); Hemphill v. New York, 380 F.3d 680 (2nd Cir. 2004). The test applicable in such instances is whether the actual or threatened retaliation "is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." See, e.g., Morris v. Powell, 449 F.3d 682 (5th Cir.), cert. denied, 549 U.S. 1038, 127 S.Ct. 596, 166 L.Ed.2d 443 (2006). See also Hemphill v. New York, supra. Finally, the Fifth Circuit has advised that the issue of administrative exhaustion need not be presented to a jury and that:

> When the defendant raises exhaustion as an affirmative defense, the judge should resolve disputes concerning exhaustion prior to allowing the case to proceed to the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary. Then, if the judge determines that the plaintiff has exhausted administrative remedies or that his or her failure to exhaust should be excused, the case may proceed to the merits.

Dillon v. Rogers, supra.

Because administrative exhaustion is an affirmative defense, the defendant has the initial burden of demonstrating that the plaintiff has failed to exhaust available administrative remedies. Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Where, however, as here, the defendant has met this initial burden, the burden shifts to the plaintiff to establish that the administrative exhaustion requirement should be excused. See Schipke v. Van Buren, 239 Fed.Appx. 85 (5th Cir. 2007). Specifically, the Fifth Circuit has taken the position that, because administrative exhaustion is mandatory, exceptions to the exhaustion requirement apply only in "extraordinary circumstances," and it is the prisoner plaintiff who bears the burden of demonstrating the futility or unavailability of administrative review. Id.

Based upon Dillon, Schipke, and in light of the above-described factual dispute between the parties, the Court scheduled an evidentiary hearing in this case to resolve the factual issues relative to administrative exhaustion.

## Review of the Evidence

Major Trent Barton testified that, at the time of the events complained of herein, the plaintiff was classified to the Camp J Management Program at LSP, which is a punitive segregated housing unit for inmates with disciplinary problems at the prison. The normal procedure for inmates sent to Camp J is that they are initially classified at Level 2 of the 3-level Program and are then evaluated at monthly intervals and given an opportunity, with good behavior, to move up to Level 3 after the

expiration of 90 days. In the event that an inmate continues to exhibit good behavior, the inmate is then evaluated, after another 90 days, for a transfer to a less punitive part of the prison. However, as might be expected, any instance of bad behavior may result in the inmate remaining at Camp J and/or being classified to a more onerous Level of the Program, from which the inmate must then work his way back up to Level 3 in order to potentially leave Camp J.

Major Barton testified that, as part of his duties as a then-Captain at Camp J, he received and reviewed most of the administrative grievances filed by inmates housed at Camp J. Upon such review, he would normally go to the inmate to see if the grievance could be amicably resolved. According to the witness, he received approximately 40-50 grievances per week, and most of these grievances, as many as 90%, were voluntarily withdrawn if the inmates' problems could be addressed. However, if an inmate's grievance could not be amicably resolved, the grievance would be sent to the Secretary's office where all pertinent documentation would be compiled, and a grievance packet would then be sent back to Camp J for the shift supervisor to distribute to pertinent officers for written statements. The witness testified that he was often named in grievances filed by inmates at Camp J but was never angry or upset when inmates either named him in grievances or refused to voluntarily withdraw grievances. The witness further stated that he never threatened or coerced the plaintiff or any other inmate to withdraw an administrative grievance. The witness further testified that he was familiar with the plaintiff and that the plaintiff was known to be a frequent filer of administrative grievances.

Finally, Major Barton testified that he recalled visiting the plaintiff's cell tier on January 14, 2011, and was probably accompanied by Ass't Warden Chad Menzina and Col. Ray Vittorio. The witness believed that he spoke with the plaintiff at that time about voluntarily withdrawing an administrative grievance but denied that he or either of the other two officers utilized any threats or coercion against the plaintiff. Major Barton did not recall the plaintiff being escorted to a nearby office to speak with him and officers Menzina and Vittorio (as the plaintiff contends) or that the plaintiff was subjected to a search on that date. The witness did recall, however, participating in a disciplinary hearing several days later, on January 19, 2011, relative to a search conducted of the plaintiff on January 14, 2011. Upon further questioning, however, this recollection was called into question because the disciplinary record of that hearing reflected that Ass't Warden Menzina, not Major Barton, conducted the disciplinary hearing of that date.

Officer Cecil Hilburn testified that he was the officer assigned to the plaintiff's cell tier on January 14, 2011, and that he prepared the disciplinary report of that date charging the plaintiff with "Contraband" and "Aggravated Disobedience". He testified that the disciplinary report was an accurate statement of what occurred and what he observed. He further testified that the referenced disciplinary charges were the result of a "random shakedown" of the plaintiff on the morning of that date, and the witness did not specifically recall having seen Major Barton, Ass't Warden Menzina or Col. Vittorio on the tier that morning. Officer Hilburn assured the Court, however, that in any event, he did not observe any threats or coercion employed against the plaintiff. A copy of the referenced disciplinary report was admitted into evidence which reflected that, during a visual body cavity search of the plaintiff at 11:15 a.m. on January 14, 2011, Officer Hilburn observed a contraband cigarette lighter. According to the report, the plaintiff initially refused orders to relinquish the lighter but ultimately complied.

Ass't Warden Chad Menzina next testified regarding his recollection of the events of January 14 and 19, 2011. The witness began by expressing his familiarity with the Camp J Management Program. He acknowledged that one of the main purposes of the Management Program is to alter or modify the bad behavior of problem inmates, and that inmates are allowed to work their way out of the Program with good behavior. He testified that, as a general rule, an inmate with good behavior can work his way out of the Program in approximately seven months. This allows for two 90-day review periods for the inmate to move from an initial classification at Level 2 of the Program up to Level 3 and then out to another area of the prison. The witness also testified regarding the grievance process at the prison and stated, consistent with the testimony of Major Barton, that many inmates (75% according to the Warden Menzina) voluntarily withdraw their grievances after being asked to do so and after their complaints have been heard and addressed. Warden Menzina asserted that he is never angry or upset when an inmate names him in a grievance or when an inmate declines to withdraw a grievance, nor does he ever threaten or coerce an inmate who does not wish to withdraw a grievance.

With regard to the plaintiff's specific claims, Warden Menzina testified that he had no independent recollection of the events of January 14, 2011, either with regard to asking the plaintiff to withdraw a grievance on that date, having the plaintiff escorted to an office for further discussion regarding the grievance, or conducting a search of the plaintiff's body or cell. While the witness did

vaguely recall talking with the plaintiff on one occasion in an office at LSP, the witness did not believe that it was at this time or regarding this grievance. Warden Menzina did, however, review the disciplinary report relative to the plaintiff's disciplinary charge of January 14, 2011, and acknowledged that the signature below the report indicated that the witness had presided over the plaintiff's subsequent disciplinary hearing on January 19, 2011. According to the witness, the disciplinary report indicated that the plaintiff had pleaded guilty to the charges levied against him. Warden Menzina further testified that he recalled that the plaintiff was allowed to transfer out of the Camp J Management "shortly after" the events of January, 2011, or perhaps after the next 90-day review board. Upon further questioning, however, the witness clarified, from a review of the plaintiff's Inmate Location Sheet, that the plaintiff was not transferred out of the Camp J Management Program until July 14, 2011, approximately 6 months later.

Finally, Warden Menzina testified regarding the physical layout of Camp J at LSP and the reliability of the LSP Inmate Location Sheets which are maintained by prison personnel and which reflect the locations of inmates on particular dates. Upon a review of the plaintiff's Inmate Location Sheet, the witness testified that the plaintiff was housed on Shark Unit, Tier 2-L, on the morning of January 14, 2011, and was transferred on that date to Gar 1-R, where he remained until January 19, 2011, on which date he was transferred back to Shark 2-L. Warden Menzina further testified that inmates located on one tier at Camp J, e.g., on Shark Unit 2-L, are physically unable to see or hear anything occurring on any other tier within Camp J.

Col. Ray Vittorio testified next, and the testimony provided by this witness regarding the administrative remedy procedure at LSP was essentially the same as that provided by Major Barton and Ass't Warden Menzina. Specifically, Col. Vittorio acknowledged that it was normal procedure for prison officials to visit inmates for the purpose of requesting the withdrawal of administrative grievances when issues raised in the grievances could be addressed or resolved. Notwithstanding, the witness asserted that prison officials do not offer "deals" to inmates in exchange for their withdrawal of pending grievances. The witness further testified that he never became upset or angry when inmates named him in their grievances or refused to voluntarily withdraw pending grievances. Nor has the witness ever yelled, threatened or coerced an inmate in reference to withdrawing an administrative grievance. The witness further testified that he does not have access to irritant spray

on the cell tiers and so could not have brandished a can of irritant spray (as asserted by the plaintiff) in order to induce the plaintiff to withdraw a pending grievance.

With regard to the plaintiff's specific contentions, Col. Vittorio testified that he had no independent recollection of the events of January, 2011, but recalled having talked to the plaintiff on one or more past occasions about dropping grievances and recalled the plaintiff having voluntarily agreed to do so on several occasions. Col. Vittorio also recalled speaking to the plaintiff on an unspecified date about the plaintiff's wish to be transferred out of Camp J, and the witness testified that he was instrumental in causing such a transfer to occur at a later date. Finally, Col. Vittorio acknowledged his signature as a witness on the plaintiff's withdrawal form of January 19, 2011, and asserted his recollection that the plaintiff did not appear to be scared or under stress at that time. To the contrary, the witness recalled the plaintiff appearing to be relaxed and "happy-go-lucky" when signing the referenced form withdrawing the grievance.

Consistent with the earlier testimony of Warden Menzina, Col. Vittorio confirmed that inmates housed on one cell tier at Camp J are physically unable to see or hear events occurring on other tiers, and that the LSP Inmate Location Sheets are an accurate reflection of the housing assignments of inmates on the dates indicated in the documents.

Finally, the defendant called Capt. Kenneth Harris to testify regarding having witnessed the plaintiff sign the form withdrawing his grievance on January 19, 2011. Captain Harris had little to add to the previous testimony other than to re-confirm that there were no curses, yelling or threats directed at the plaintiff, that there were no cans of irritant spray in evidence at any time, and that the plaintiff gave no indication whatever that he was scared, intimidated or under duress. The witness testified that, to the contrary, the plaintiff's demeanor was "happy-go-lucky" when he signed the withdrawal form.

In support of his contentions, the plaintiff provided the testimony of himself and five (5) co-inmate witnesses. He testified that on the morning of January 14, 2011, he was housed at Camp J, Shark Unit, Tier 2-L, and was approached in his cell by then-Capt. Trent Barton, Ass't Warden Chad Menzina and Col. Ray Vittorio and questioned with regard to withdrawing a pending grievance which the plaintiff had filed regarding an incident in 2010 when the plaintiff was attacked in his cell by a known enemy co-inmate. When the plaintiff refused to withdraw the referenced grievance, he was placed in restraints and escorted to an office where the three officers again urged the plaintiff

to withdraw the pending grievance. According to the plaintiff, the officers alternated between offering him fried fish as an inducement to withdraw the grievance and threatening to make the plaintiff "pay" if he refused. When the plaintiff continued to refuse, he was returned to his cell and, a short while later, the three officers returned, ordered the plaintiff to remove his clothing, and ordered the plaintiff to undergo a visual body cavity search, during which the plaintiff was instructed to turn around, bend over, and spread the cheeks of his buttocks. When the plaintiff complied, the officers observed a cigarette lighter in the plaintiff's rectum and ordered the plaintiff to throw it out onto the cell tier, which the plaintiff did. The plaintiff was then escorted to the shower cell on the cell tier where Capt. Barton again asked the plaintiff to withdraw the pending grievance. When the plaintiff again refused, Capt. Barton told the plaintiff that the plaintiff would never be allowed to leave Camp J and that the plaintiff could expect to be subjected to harassment and to irritant spray in the future. The plaintiff was then escorted to administrative segregation in the Gar Unit of Camp J, Tier 1-R.

According to the plaintiff, he was visited the next day by Col. Vittorio, who brandished a can of irritant spray in a threatening manner and urged the plaintiff to withdraw the pending grievance. When the plaintiff asked whether he could obtain a release from Camp J if he agreed to withdraw the grievance, Col. Vittorio responded in the affirmative. The plaintiff refused to withdraw the grievance, however, when Col. Vittorio would not agree to such release immediately, and Col. Vittorio again allegedly threatened to keep the plaintiff at Camp J indefinitely.

Finally, prior to the plaintiff's scheduled disciplinary hearing on January 19, 2011, he was again approached by one or more of the three officers and was again urged to withdraw the pending grievance. This time, because the plaintiff feared being kept at Camp J, being transferred to a more onerous Level, and being subjected to continued harassment and to the use of irritant spray, the plaintiff agreed to withdraw the grievance. According to the plaintiff, he was promised in exchange that he would only receive a "slap on the wrist" sentence in connection with the pending disciplinary charges, that he would be transferred out of Camp J within 30 days, and that he would not be subjected to irritant spray. He testified, however, that in keeping with advice given by a co-inmate on the cell tier, Carlos McGrew, the plaintiff signed the withdrawal form with a surreptitious "U.D." to indicate that he was signing the withdrawal "under protest". The plaintiff further testified that when he was not thereafter released from Camp J within 30 days, he attempted to re-file his original grievance, but this attempt was unsuccessful when the grievance was rejected as being untimely.

The plaintiff called as witnesses five (5) co-inmates to corroborate his story. With regard to the events of January 14, 2011, the plaintiff called co-inmate Donald Mitchell, who testified that 3 officers come to the plaintiff's cell on that date, offered the plaintiff a transfer out of Camp J if the plaintiff agreed to withdraw a pending grievance, threatened and cursed the plaintiff when he refused to do so, and subjected the plaintiff's cell to an "enthusiastic shakedown". Co-inmate Mitchell, however, was not aware of any disciplinary charges levied against the plaintiff on that date.

The plaintiff also called as a witness co-inmate Jemetric Debrow, who offered testimony similar to that of co-inmate Mitchell regarding threats on January 14, 2011, a resulting search, and a purported planting of contraband in the plaintiff's cell. Upon cross-examination, however, it became clear from the pertinent Inmate Location Sheet that co-inmate Debrow was not housed on the plaintiff's cell tier on the referenced date and so could not credibly testify regarding the referenced events.[1]

With regard to events occurring after the plaintiff was transferred from Shark 2-L to Gar 1-R, the plaintiff called three (3) co-inmate witnesses. First, co-inmate Carlos McGrew recalls the plaintiff arriving at Gar 1-R on January 14, 2011, and remembers the plaintiff stating that he had been sent there in connection with a "bogus" disciplinary report, charging the plaintiff with "Contraband", and that the plaintiff was "set up" because the plaintiff refused to withdraw a pending administrative grievance. Co-inmate McGrew recalls that the plaintiff was worried about further harassment and about being transferred to Level 1 of Camp J and, accordingly, was considering the possibility of withdrawing the pending grievance. Co-inmate McGrew testified he recommended that the plaintiff to sign "U.D." on the contemplated withdrawal form so that the plaintiff could thereafter explain to a court, if necessary, that the withdrawal form was signed "under protest". Co-inmate McGrew also testified that it was his experience that prison officials often threatened, coerced and retaliated against inmates who named specific officers in administrative grievances or refused to withdraw pending grievances.

The plaintiff also called as a witness co-inmate Noel Dean who was housed at Gar 1-R at the same time as the plaintiff and who was told by the plaintiff that the plaintiff had been sent to Gar for

---

1. Co-inmate Debrow disputed the accuracy of the referenced Inmate Location Sheet. Notwithstanding, the Court finds the Location Sheet to be a reliable indication of where the co-inmate was housed on the referenced date.

refusing to withdraw a pending grievance. Co-inmate Dean also testified that he observed Ass't Warden Menzina and Col. Vittorio come to the plaintiff's cell and threaten the plaintiff with disciplinary punishment and with irritant spray if the plaintiff continued to refuse to withdraw the grievance. According to co-inmate Dean, the plaintiff was worried and stressed about the officers' threats and ultimately agreed to withdraw the grievance in response to those threats.

Finally, the plaintiff called as a witness co-inmate Anthony Young regarding events allegedly occurring on Gar 1-R. However, as with co-inmate Jemetric Debrow, the Inmate Location Sheet for co-inmate Young reflected that the witness was not housed at that location on the pertinent dates and so was not able to credibly testify regarding any threats or coercion.[2]

### Findings of Fact

Based on the foregoing, the Court finds that the plaintiff has not carried his burden of proof with regard to the exhaustion of administrative remedies. Specifically, the Court notes numerous inconsistencies between the plaintiff's various contentions and the testimony adduced at trial, and the Court does not find it credible that the plaintiff withdrew the referenced administrative grievance solely, or for the most part, because of coercion or threats issued by prison security officers. In the first place, although the plaintiff has previously asserted that the disciplinary report charged against him on January 14, 2011, was a set-up and was the result of contraband planted in his cell for the purpose of inducing him to withdraw the grievance and/or as a means of punishment in the event that he refused to do so, see attachments to rec.doc.no. 48, the testimony adduced at the evidentiary hearing makes clear that the plaintiff was in fact in possession of contraband when he was searched on the referenced date. Specifically, the plaintiff testified at the hearing that a cigarette lighter was in fact hidden in his rectum at the time of the search and that he complied with orders to relinquish the lighter to prison officials. Thus, the disciplinary charge levied against him, accusing him of being in possession of contraband, which charge carried with it the real possibility of a transfer from Level 3 to a more onerous Level of the Camp J Management Program, was entirely warranted and provided ample justification for the plaintiff's transfer to Gar 1-R. Although the plaintiff contends that the initial search and verbal harassment themselves constituted wrongful harassment and retaliation

---

2. As with co-inmate Debrow, co-inmate Young also contested the accuracy of the pertinent Inmate Location Sheet.

by prison officials in response to his refusal to withdraw his grievance, the Court finds that these actions only amounted to de minimis conduct that was not sufficient, as a matter of law, to induce an inmate of ordinary firmness to relinquish his constitutional right to pursue an administrative grievance.  See Howell v. Quarterman, 2008 WL 4724486 (S.D. Tex., October 24, 2008) (holding that an alleged retaliatory search did not result in an adverse act that was more than de minimis); Green v. Hamilton, 2007 WL 2815643 (W.D. Tex., Sept. 25, 2007) (same); Ali v. Jones, 2007 WL 2141381 (S.D. Tex., July 19, 2007) (same).  See also Randolph v. London, 400 Fed.Appx. 894 (5th Cir. 2010) (holding that retaliation in the form of threats and verbal abuse is de minimis); Watson v. Phillips, 2010 WL 5336965 (E.D. Tex., Oct. 29, 2012) (same).  Accordingly, the alleged retaliatory search and verbal harassment on January 14, 2011, would not provide a sufficient excuse for the plaintiff's failure to exhaust administrative remedies.  And once the plaintiff was found to be in actual possession of contraband, he lost the ability to complain of the resulting disciplinary charge as a basis for such failure.

In addition to the foregoing, the plaintiff adduced evidence at the hearing that, in the Court's view, was unquestionably false and, as a result, greatly reduced his credibility before this Court. Specifically, two of the five (5) witnesses subpoenaed by the plaintiff to corroborate his allegations, were not even housed on the plaintiff's cell tier on the dates in question and so could not have witnessed the events that they purported to have observed.

In contrast to the plaintiff's version of the above-related events, the credible evidence supports a finding by the Court that it is more likely that the plaintiff withdrew his pending grievance, not because of coercion or threats by the referenced prison officials but, rather, because of the officials' promise of leniency in connection with the admittedly legitimate disciplinary charges hanging over the plaintiff's head.  The plaintiff has repeatedly stated that he wished to obtain a transfer out of Camp J, and he acknowledges that the referenced officials promised him such a transfer if he withdrew the grievance.  Accepting the plaintiff's assertions as true, he repeatedly refused to withdraw the grievance when he was cursed and yelled at, was subjected to intimidation in a private office, was subjected to an invasive search, and was threatened with irritant spray and with further harassment by officers Barton, Menzina and Vittorio.  It was not until (1) a valid disciplinary charge was levied against him, pursuant to which he faced a potential legitimate disciplinary sentence of a transfer to a more onerous Level of the Camp J Management Program, and (2) he was offered a

more lenient sentence in connection with the disciplinary charge and a subsequent transfer out of the Program, that he agreed to withdraw the grievance.  Although he wrote "U.D." on the withdrawal form, he did not advise any of the witnessing officers that he was doing so or that he was signing the form under duress, and the officers themselves testified that they had no indication that the plaintiff was in fear or was anything more than "happy-go-lucky" at the time that he signed the form.  Finally, although the plaintiff asserts that he subsequently attempted to re-file his administrative grievance, he admitted that he did so only after prison officials failed to afford him a transfer out of Camp J as promised.  This provides further support for the Court's conclusion that the plaintiff's motivation for agreeing to withdraw his grievance was the "carrot" offered by prison officials in the form of the promised transfer, and not the "stick" extended by them in the form of threats of further harassment.

      Notwithstanding the foregoing, the Court notes that it does not find credible the assertions of the testifying prison officials that no threats, curses or harassment were employed in attempting to induce the plaintiff to withdraw the pending administrative grievance.  Each of these officers testified that it is normal procedure for prison officials to approach inmates for the purpose of encouraging them to withdraw pending grievances.  The Court further concludes that the more serious a claim asserted in a grievance is, and the greater the possibility that the grievance will result in administrative inconvenience and/or lead to litigation or monetary recovery, the more likely it is that prison officials will bring pressure to bear on the complaining inmate.  Further, inasmuch as a grievance asserting a valid substantive claim against a correctional officer can result in adverse employment action against the officer, the Court finds it likely that grievances which assert valid substantive claims against named officers can in fact cause anger and/or trepidation on the part of the officers when the inmate refuses to withdraw the grievance.  The danger of undue coercion is further heightened when, as in this case, the officers who seek the withdrawal of an inmate's grievance are three high-ranking prison officials who arrive en masse at the inmate's cell and/or who escort the inmate to a private office where they continue to "encourage" him to withdraw the grievance.  Thus, the Court finds credible the plaintiff's assertion in the instant case that prison officials in fact utilized threats and harassment to some extent in urging him to withdraw his grievance, and that they in fact offered him a deal as inducement to do so.  The Court further finds

it likely that the search of the plaintiff on January 14, 2011, was part of this harassing conduct.[3] Notwithstanding, the Court is unable to conclude that this conduct justified the plaintiff's withdrawal of his grievance and his resulting failure to exhaust administrative remedies. As previously noted, the referenced search and harassment were legally de minimis acts of harassment that cannot justify the plaintiff's failure to exhaust administrative remedies. Thereafter, once contraband was in fact discovered during the referenced search, the plaintiff faced valid disciplinary action independent of the officers' alleged threats and harassment. As a result, the Court finds that it was the subsequent offer of a beneficial result in connection with the pending disciplinary charges which induced the plaintiff to withdraw the grievance, not the alleged threats of disciplinary action and further harassment. Accordingly, the plaintiff should not be excused from the requirement of administrative exhaustion in this case.

## RECOMMENDATION

It is recommended that the Court find that the plaintiff has failed to exhaust administrative remedies relative to his claims as mandated by 42 U.S.C. § 1997e, and that this action be dismissed, without prejudice, but with prejudice to re-assertion of the same claim or claims in forma pauperis.[4]

Signed in Baton Rouge, Louisiana, on November 8, 2012.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**

---

3. Although not offered into evidence at the evidentiary hearing, the defendant listed LSP Directive No. 09-003 (relative to "Searches of Inmates") as an Exhibit, and this regulation discloses numerous irregularities in the visual body cavity ("vbc") search conducted of the plaintiff on January 14, 2011. Pursuant to this regulation, a vbc search may be conducted only upon written approval of the Warden or his designee and only upon a specific and particular showing of reasonable suspicion. The search is to be conducted by two officers who shall document the search in the unit logbook and who shall include therein a statement regarding the specific and particular showing of reasonable suspicion. Thus, the purported "random" search of the plaintiff on January 14, 2011, supposedly conducted by a single officer and not documented in the unit logbook, was not an authorized vbc search. The Court finds it far more likely that the search was conducted by officers Barton, Menzina and Vittorio, whose presence on the plaintiff's cell tier at approximately the time of the referenced search is documented from a review of the plaintiff's tier logbook.

4. See Underwood v. Wilson, 151 F.3d 292 (5th Cir. 1998).